OPINION.
{¶ 1} This an appeal and a cross-appeal from partial summary judgments the trial court granted and denied on the parties' respective motions. The matters in dispute arise from the termination by Plaintiffs, Dr. Calvert R. Busch and Dr. Woodhull Kiefaber, of their association with Defendant, Premier Integrated Medical Associates, Inc. ("PriMed"), a medical practice group.
 {¶ 2} PriMed was organized by a group of physicians that included Drs. Busch and Kiefaber. Each signed similar employment agreements with PriMed early in 1995. Busch and Kiefaber are cardiologists. It was the intention of PriMed's organizers to create a large, multi-specialty group that could both (1) provide the various kinds of care that its patients required and (2) obtain the greater leverage that larger size offers when negotiating with insurance companies and HMO's for reimbursement.
 {¶ 3} In April of 1999, Busch and Kiefaber notified PriMed that they intended to terminate their memberships in PriMed. Both remained members and practiced there until September of 1999, when they departed and joined another medical practice group. Their new group competed with PriMed for cardiology practice at local hospitals. It obtained some of the business PriMed had previously obtained from Kettering Medical Center. The new group, or Busch or Kiefaber, also hired-away PriMed employees for the new group.
 {¶ 4} Four months after leaving PriMed, Busch and Kiefaber commenced the underlying action against PriMed, seeking repayment of promissory notes evidencing loans each had made to PriMed in 1995. PriMed denied liability and filed counterclaims against Busch and Kiefaber alleging multiple claims for relief, including a claim that Busch and Kiefaber violated covenants not to compete, that they tortiously interfered with PriMed's business relationship with Kettering Medical Center, and that they breached the duty of loyalty they owed PriMed as employees. Busch and Kiefaber then amended their complaint, adding claims for restitution of paid-in capital contributions, reimbursements for loans, unjust enrichment, and that PriMed had engaged in an abuse of process when it filed its counterclaims.
 {¶ 5} Each side moved for summary judgment on the other's claims for relief. The trial court sustained in part and overruled in part the motions for summary judgement each side filed. PriMed appealed, and now presents six assignments of error. Busch and Kiefaber cross-appealed, and now present seven assignments of error.
 PRIMED'S FIRST ASSIGNMENT OF ERROR {¶ 6} "The Trial Court Erred IN Not Properly Applying The Rule Of Reasonableness Analysis Set Forth By The Supreme Court In Raimonde v. Van Vlerah."
 {¶ 7} The employment agreement that Busch and Kiefaber signed when they became members of PriMed in 1995 contains the following covenant not to compete:
 {¶ 8} "[T]he Physician agrees that he will not, during the term of this Agreement and for a period of one (1) year thereafter, directly or indirectly engage in, or have any interest in any person, firm, corporation, partnership, sole proprietorship or business (whether as an employee, officer, director, agent, security holder, creditor, consultant, partner, sole proprietor, joint venturer, co-venturer, stockholder or otherwise) that engages in the provision of medical services (inpatient or outpatient) within Montgomery County, Ohio and any adjacent county (the `Restricted Area')."
 {¶ 9} The agreement further provides that if a physician violates the covenant, the physician shall forfeit any monies due from PriMed as compensation and benefits, as well as severance pay, shall pay PriMed $300,000, and shall, at PriMed's election, pay over to PriMed any monies the physician earned in an activity in breach of the covenant.
 {¶ 10} In Raimonde v. VanVlerah (1975), 42 Ohio St.2d 21, the court wrote:
 {¶ 11} "We hold that a covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests. A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public. Courts are empowered to modify or amend employment agreements to achieve such results." Id. pp. 25-26.
 {¶ 12} Among the factors that Raimonde identified as relevant to this inquiry is "whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition." Id., at p. 25, quoting Extine v. WilliamsonMidwest (1964), 176 Ohio St. 403. The trial court found that PriMed's covenant does not seek to eliminate unfair competition, but only ordinary competition. PriMed challenges that finding.
 {¶ 13} PriMed cites the relative weakness of health care providers when bargaining with insurance companies and HMO's in today's competitive market for healthcare services, which limits revenues providers need to deliver services and limits the kind and quality of health care and treatment that patients require. PriMed argues that it devised a new model of organization to counterbalance the market dominance of insurance companies and HMO's, one in which physicians band together to benefit from the superior bargaining position that larger size confers. Further, and with respect to the matter in issue, PriMed argues that the covenants not to compete which all its physicians signed is necessary to the existence of its new model because the prohibitions and penalties of the covenant is the "glue" that holds the model together. Therefore, according to PriMed, its covenant advances a legitimate business interest which, per Raimonde, justifies the competitive restrictions involved.
 {¶ 14} We do not doubt or question PriMed's arguments about the state or condition of the market for medical services. Advances in technology have loosened if not almost wholly eliminated the controls that formerly derived from the governmental restrictions imposed by public policy and the institutional restrictions which the practice of medicine traditionally involved. Absent the structural limitations those factors once provided, physicians are now exposed to the greater leverage that insurance companies and HMO's have on questions of reimbursement. In consequence, physicians have found it to their advantage to band together to "market" their services as a unit and, in the process, acquire greater leverage when negotiating with insurance companies and HMO's. To do so is surely a valid protection of a legitimate business interest.
 {¶ 15} The question, however, is not whether the business interest that PriMed seeks to protect through the use of its covenant is one which a competitive enterprise might properly seek to advance. The question is whether the particular form of competition the covenant restricts is in its nature and character unfair to PriMed. If it is, then the covenant's restrictions are reasonable and enforceable.
 {¶ 16} We have held that factors to be considered in determining reasonableness of the restrictions a covenant imposes include "(1) the existence of time and geographic limitations; (2) whether the employee represents the sole contact with the customer; (3) whether the employee possesses confidential information or trade secrets; (4) whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; (5) whether the covenant seeks to stifle the inherent skill and experience of the employee; (6) whether the benefit to the employer is disproportional to the detriment to the employee; (7) whether the covenant operates as a bar to the employee's sole means of support; (8) whether the employee's talent which the employer seeks to restrict was actually developed during the period of employment; and (9) whether the forbidden employment is merely incidental to the main employment." Pratt v. Grunenwald (June 29, 1994) Montgomery App. No. 14160 (citing Raimonde, supra at 25).
 {¶ 17} PriMed argues that Busch and Kiefaber's competition with PriMed is unfair because it violates the covenant. That contention is mere boot-strapping. Covenants not to compete are valid only when the competition they restrict is somehow unfair, not because it is unfair that the promisor fails to perform on the promise he made.
 {¶ 18} PriMed also argues that its covenant isn't subject to theRaimonde analysis at all because, by its terms, the covenant doesn't prohibit competition and PriMed isn't seeking injunctive relief. PriMed argues that it asks only to enforce its rights under the covenant to "liquidated damages," which distinguishes its claim from the claims in other cases that involved requests for injunctive relief in order to enforce similar covenants.
 {¶ 19} PriMed's claim for relief asks for a judgment "[i]n an amount in excess of $300,000 against Busch and in an amount in excess of $100,000 against Kiefaber." Those figures appear to relate to the formulas for which the covenant provides. They are, according to PriMed, compensation reasonably due PriMed for its losses arising from Busch and Kiefaber's stated repudiation of the corporate debts of PriMed that each had agreed to pay.
 {¶ 20} Busch and Kiefaber's repudiation doesn't rid them of any liability they may have to pay a share of PriMed's debts for which they may be responsible. PriMed's rights in that regard are enforceable against them in law. So, resorting to these claims for money judgments on that account is unnecessary to protect PriMed's interests in that respect.
 {¶ 21} More significantly, PriMed's claim for money judgments against Busch and Kiefaber for violating their covenant not to compete isn't a claim for liquidated damages at all. "Liquidated damages" are damages fixed by prior agreement which (1) are reasonably susceptible of ascertainment pursuant to the agreement and (2) which in their amount reasonably correspond to the value of injuries and losses the claimant actually suffered. If PriMed suffered losses because of Busch and Kiefaber's breach of their covenant not to compete, these amounts fixed by prior agreement in no way correspond to the value of those damages. They are, instead, penalties imposed for the breach.
 {¶ 22} Penalties in the form of money judgments deter the particular conduct for which they are awarded. When the conduct is competition, money damages operate to diminish competition in the market concerned. There is no effective difference between money damages as a penalty for breach of a covenant not to compete and injunctive relief to prevent the breach from taking place, at least not with respect to the enforceability of the rights the covenant confers under the Raimonde
analysis. Westco Group, Inc. v. City Mattress (Feb. 15, 1985), Montgomery App. No. 12619. The issue is whether the covenant is unenforceable as against public policy. If it is, then neither form of relief is available for a breach of the promises involved. Id.
 {¶ 23} PriMed's organizational goals are, or were, valid and legitimate. The economies involved are really no different from those that any pooling arrangement confers. For well over one hundred years, farmers have banded together to improve their position in negotiating both lower freight rates to bring their crops to market and higher prices for the crops they sell there. However, farmers who do that can opt out of the marketing pool and sell their crops through another arrangement they believe is more beneficial. That is precisely what PriMed's covenant not to compete inhibits, at least with respect to the establishment of a competitive medical practice within the restricted area for one year after a physician's departure from PriMed.
 {¶ 24} PriMed's desire to maintain its larger size simply isn't a sufficient justification for the anti-competitive effects of its covenant. PriMed's burden to show that justification is one which is demanding, because "[t]he law does not favor restrictive covenants * * * [t]his measure of disfavor is especially acute concerning restrictive covenants among physicians, which affect the public interest to a much greater degree." Ohio Urology, Inc. v. Poll (1991), 72 Ohio App.3d 446, at 452-453.
 {¶ 25} One might even question how the covenant not to compete actually enforces the legitimate business interest that PriMed says it seeks to protect. The covenant bars competitive medical practice by a subscribing physician only when the practice is undertaken within Montgomery County, Ohio, or a county adjacent to it. If a subscribing physician departs PriMed to practice in Hamilton County or Franklin County, the covenant is not violated, yet PriMed's size is diminished. The resulting disadvantage to the business interest PriMed cites and relies on is no different from that resulting from a physician's departure to open another practice down the street.
 {¶ 26} PriMed's covenant appears to be no different in its purpose and application than any other private agreement in restraint of trade, which the law has sought to prevent for well over one hundred years in order to preserve and to promote competition. That does not mean that competition among providers of health care services is necessarily good; many argue that application of the market model to allocate health care services is a snare and a delusion. It merely means that private agreement of this kind may not be used to limit competition, notwithstanding the changes in the market for health care services which have resulted from the disappearance of traditional restrictions and the collapse of public policy governance.
 {¶ 27} We agree with the trial court that the covenant not to compete does no more than eliminate or limit ordinary competition and does not protect against a form of competition unfair to PriMed, an element necessary to the legitimate business interest which Raimonde
holds a party may enforce and protect through a covenant not to compete. The covenant is therefore unenforceable, and PriMed is not entitled to any relief in law for Busch and Kiefaber's violations of the covenant, including money damages or penalties.
 {¶ 28} PriMed's first assignment of error is overruled.
 PRIMED'S SECOND ASSIGNMENT OF ERROR {¶ 29} "The Trial Court Erred In Finding A Genuine Issue Of Material Fact As To Whether Busch And Kiefaber Are Entitled To A Return Of Their $1,000 Capital Contribution."
 {¶ 30} The physicians who formed PriMed each paid-in a capital contribution of $1,000 when PriMed was organized. The operating agreement between PriMed and those physicians, including Busch and Kiefaber, relieves PriMed of its obligation to return a physician's $1,000 capital contributions if the physician violates PriMed's covenant not to compete.
 {¶ 31} PriMed argues that the trial court's error in granting summary judgment against PriMed's claim that Busch and Kiefaber violated the covenant not to compete, when reversed, relieves PriMed of its obligation to repay the $1,000 capital contributions. PriMed argues that the trial court erred in overruling its own motion for summary judgment on Busch and Kiefaber's claims asking repayment of their $1,000 capital contributions.
 {¶ 32} The necessary predicate to PriMed's argument is a finding that the covenant not to compete is valid and enforceable. Because we have overruled PriMed's first assignment of error on a finding that the covenant not to compete is unenforceable, logic compels the same result with respect to the error assigned here.
 {¶ 33} PriMed's second assignment of error is overruled.
 PRIMED'S THIRD ASSIGNMENT OF ERROR {¶ 34} "The Trial Court Erred By Refusing To Modify The Terms Of Primed's Non-Solicitation Covenant So As To Render It Reasonable."
 {¶ 35} Busch and Kiefaber's employment contracts also provide:
 {¶ 36} "During the term of this Agreement and for one (1) year thereafter, the Physician shall not, directly or indirectly, hire solicit, encourage to leave the employment of, or engage to cease to work the Employer, any employee of the Employer, or any independent contractor with the Employer, or hire any employee who has left the employment of the Employer."
 {¶ 37} The term "Restricted Entity" is defined as:
 {¶ 38} "Any entity that arranges for provides medical services in the Restricted Area and is a hospital or affiliate thereof, an insurance or managed care company or affiliate thereof, or a physician group or physician network having more than 50 physician members, owners, or providers."
 {¶ 39} The employment contract provides penalties for a violation of this non-solicitation covenant similar to those for which it provides for a violation of the covenant not to compete. The trial court found that this non-solicitation covenant is unenforceable for much the same reasons as the covenant not to compete.
 {¶ 40} Raimonde held that when a court finds a covenant not to compete unenforceable, the court may nevertheless "fashion a contract reasonable between the parties, in accord with their intention at the time of contracting, and enables them to evaluate all factors comprising `reasonableness' in the context of employee covenants." Id., at p. 25. Thus, the court can modify the agreement to protect an employer's legitimate business interests while excising protective mechanisms that are enforceable.
 {¶ 41} PriMed argues that the business interest its non-solicitation covenant was intended to protect is its interest in maintaining stability, which would be negatively affected by a sudden outflow of employees. The covenant is an attempt to avoid that result, which might be anticipated when a member physician leaves. Indeed, that happened here; six of seven employees that Busch and Kiefaber hired to work in their new group are former PriMed employees.
 {¶ 42} PriMed argues that the trial court should have amended the terms of the non-solicitation covenant to render its restrictions reasonable, per Raimonde. The court might do that, according to PriMed, by limiting the covenant's prohibitions to solicitations of long-term PriMed employees, and/or by excluding from its coverage any PriMed employees who quit voluntarily.
 {¶ 43} The trial court declined to amend the agreement, finding that other means were available to PriMed to protect the interests involved. The court observed that those other means might include a 180-day waiting period for resignations of employees and/or non-compete agreements with them. PriMed argues that these alternatives are insufficient to protect its interests.
 {¶ 44} It is a basis to suspect some anti-competitive purpose that the covenant's coverage is limited to solicitations by or on behalf of groups of fifty or more physicians or other members that a PriMed physician joins. Those are the kind of entities that might compete with PriMed. PriMed's size and stability would likewise be reduced if the new group in question had forty, or thirty, or twenty members. Of course, the court might amend the covenant to remove any reference to group size. Even so, a further question remains; whether the purported objectives of the covenant are more reasonably served by other means. The trial court found that they could be, and we agree.
 {¶ 45} If PriMed wishes to stabilize its pool of employees against a rapid exodus of some kind, it need only enter into written contracts with the employees themselves providing for a specified term of employment. Even when several are hired on the same day, the terms could be of varying lengths of time. Further, the employee would then have an opportunity to decide whether his or her own opportunities should be subject to such a restriction. This is a more direct and far more reasonable method of achieving its goals that the broad, collateral restrictions on former members that PriMed's non-solicitation covenant imposes.
 {¶ 46} Employment contracts that limit its employees' freedom of movement might likewise impose limitations on PriMed, but such is the cost of participation in a market setting that entrepreneurial medicine involves. PriMed may contend that it is free to elect to avoid those costs, and it is. However, that does not also mean that the court must amend PriMed's covenant to assist it to do that. The court is free to choose the course it finds reasonable, if it amends the agreement at all. We find no abuse of discretion.
 {¶ 47} PriMed's third assignment of error is overruled.
 PRIMED'S FOURTH ASSIGNMENT OF ERROR {¶ 48} "The Trial Court Erred In Its Application Of Ohio Civil Rule 56 By Failing To Find A Genuine Issue Of Material Fact As To Whether Primed Can Maintain A Tortious Interference With Business Relationship Claim."
 {¶ 49} Busch and Kiefaber moved for summary judgment of PriMed's claim that Busch and Kiefaber had tortiously interfered in PriMed's business relationship with KMC, obtaining forty per cent of PriMed's KMC business. Busch and Kiefaber relied on Kiefaber's affidavit, denying any such act, and evidence suggesting a different cause for PriMed's loss of business. The trial court granted summary judgment to Busch and Kiefaber on PriMed's tortious interference claim, finding that PriMed had failed to set forth evidence in response that Dresher requires to preserve an issue for trial.
 {¶ 50} Tortious interference with a business relationship occurs when a party, "without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." A B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. Constr.Trades Council (1995), 73 Ohio St.3d 1, 14. A claim of tortious interference with another requires "(1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom." Wolf v. McCullough-Hyde Memorial Hosp. (1990),67 Ohio App.3d 349, 355.
 {¶ 51} This assignment of error implicates the rule of Dresher v.Burt (1996), 75 Ohio St.3d 280. Dresher held that a party who moves for summary judgment on an adverse party's claim for relief on a contention that the party lacks evidence to prove its claim cannot rely on a mere conclusory assertion to that effect. The movant "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." Id., at p. 293. If the moving party satisfies the burden, the non-moving party then has a . . . burden . . . to set forth specific facts showing that there is a genuine issue of material fact for trial and, if the non-movant does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party." Id.
 {¶ 52} The trial court found that PriMed's evidence could satisfy the first, second and fourth prongs of the tortious interference test, preserving the issue on those matters. However, it found that PriMed failed to present any admissible evidence that satisfied its burden with respect to the third prong of the test, which requires PriMed to show that Busch and Kiefaber had tortiously interfered with PriMed's business relationship with KMC. PriMed contends that the trial court reached that result by insisting on proof from PriMed in the form of direct evidence, when circumstantial evidence that PriMed put before the court was sufficient under Dresher. The intentional interference prong of PriMed's tortious interference claim required proof of a wrongful act. Busch and Kiefaber offered evidence showing that KMC's decision to give a share of its business with PriMed to Busch and Kiefaber's new group was a result of friction between KMC and PriMed independent of anything Busch and Kiefaber did. That required PriMed to present evidence showing that its loss of business resulted from some wrongful act on Busch and Kiefaber's part. PriMed relied on evidence of two matters.
 {¶ 53} The first matter appears in the deposition testimony of PriMed's manager, Matthews. He stated that Busch and Kiefaber made disparaging comments about PriMed to many people, and that his dealings with KMC caused Matthews to have a concern that Busch and Kiefaber may have misrepresented PriMed's position regarding its business. The trial court found these self-serving, overly-general, and conclusory statements insufficient to preserve a genuine issue of material fact necessary to overcome the evidence Busch and Kiefaber offered. We agree.
 {¶ 54} The second matter on which PriMed relied, though it was not addressed by the trial court, is evidence that Kiefaber, while an employee of PriMed, several times approached KMC to inquire about obtaining a share of the cardiology business KMC had to offer for the new group he later joined. This, according to PriMed, breached Kiefaber's contractual duty to employ his "best efforts" on PriMed's behalf while he was its employee.
 {¶ 55} Breach of a private duty imposed by contract is not a tort. Further, and notwithstanding his relationship to PriMed, Kiefaber was privileged to act as he did. Kiefaber had a right to "go after" a share of KMC's cardiology business, which PriMed then shared with two other groups. Absent any evidence that he disparaged PriMed or misrepresented its ability to properly perform that work, Kiefaber merely acted on the right and privilege all persons enjoy to pursue their economic opportunities to their maximum benefit. Tortious interference necessitates a lack of privilege. AB-Abell Elevator Co. Kiefaber was privileged to act as he did.
 {¶ 56} PriMed complains that the court insisted on direct evidence of tortious interference on its part, and that the circumstantial evidence it offered, when construed most strongly in PriMed's favor, is sufficient to preserve a genuine issue of material fact. We do not agree.
 {¶ 57} Circumstantial evidence is direct evidence of one matter from which the existence of another is logically and reasonably inferred. The fact that Kiefaber approached KMC as he did doesn't support an inference that he acted with a tortious purpose or intent. Neither is the suspicion that Matthews voiced sufficient to preserve the issue against Kiefaber's denial. To find from this evidence that Kiefaber so acted is not a reasonable inference but a mere speculation, which does not portray the existence of a genuine issue of material fact.
 {¶ 58} PriMed's fourth assignment of error is overruled.
 PRIMED'S FIFTH ASSIGNMENT OF ERROR {¶ 59} "The Trial Court Erred By Finding A Genuine Issue Of Material Fact As To Whether Primed Breached The Employment Agreement Or The Operating Agreement With Respect To Salary Payments Since There Is No Evidence Any Contractual Provision Was Breached."
 {¶ 60} PriMed's Operating Agreement provides that a member's salary will be determined by a formula specific to the member's medical specialty. Busch and Kiefaber's salaries were determined by the formula applicable to PriMed's cardiology unit. Busch and Kiefaber alleged that PriMed unfairly and arbitrarily decreased their salaries in the months prior to their departure, as retaliation after they had announced their intention to leave. PriMed moved for summary judgment on Busch and Kiefaber's claim. The trial court overruled PriMed's motion, finding that genuine issues of material fact remained for determination.
 {¶ 61} PriMed's contention is premature. However, applyingDresher to the facts before us, as the trial court did, we cannot find that PriMed presented evidence necessary to show, affirmatively, that Busch and Kiefaber have no evidence to support their breach of contract claim sufficient to impose a burden on Busch and Kiefaber to show that they do.
 {¶ 62} In its motion for summary judgment, PriMed argued merely that the compensation it paid Busch and Kiefaber was at all times based upon compensation models and formulas specifically considered and approved by them. Kiefaber and Busch offered contrary evidence showing that those formulas were improperly applied. For example, Alan Duvall, an accountant, testified that PriMed had improperly allocated revenues earned by cardiologists, improperly shifted overhead expenses to the cardiology department, and improperly calculated distributions of revenue among PriMed physicians, thereby diminishing the compensation due to Busch and Kiefaber. Even apart from any question whether PriMed satisfied its Dresher requirement, this evidence is sufficient to preserve genuine issues of material fact for trial.
 {¶ 63} PriMed's fifth assignment of error is overruled.
 PRIMED'S SIXTH ASSIGNMENT OF ERROR {¶ 64} "The Trial Court Erred In Finding A Genuine issue Of Material Fact As To Whether The Plaintiffs Can Maintain An Abuse Of Process Claim Since There Is No Evidence That The Proceeding Has Been Perverted To Attempt To Accomplish An Ulterior Purpose For Which It Was Not Designed."
 {¶ 65} Busch and Kiefaber alleged in their Amended Complaint that elements of the counterclaims PriMed had filed amount to an abuse of process. PriMed moved for summary judgment on the abuse of process claim. The trial court denied PriMed's motion. PriMed argues that the trial court erred in finding a genuine issue of material fact as to whether Busch and Kiefaber can maintain the abuse of process claim which their amended complaint presents. PriMed argues that there is no evidence that, when PriMed filed its counterclaim, PriMed thereby perverted the proceeding in an attempt to accomplish an ulterior purpose for which that proceeding was not designed.
 {¶ 66} Once again, this assignment of error leads us to theDresher v. Burt analysis. Applying Dresher to the facts before us, we cannot find that PriMed presented evidence necessary to show, affirmatively, that Busch and Kiefaber have no evidence to support their claim for abuse of process.
 {¶ 67} In its motion for summary judgment, PriMed argued that Busch and Kiefaber failed to provide any evidence that PriMed committed an abuse of process when it filed a counterclaim. A mere conclusory assertion that the nonmoving party has no evidence to prove its case is not sufficient to grant summary judgment on a nonmoving party's claims.Dresher.
 {¶ 68} It may be that Busch and Kiefaber's abuse of process claim is frivolous and subject to Civ.R. 11 sanctions. However, because PriMed's Civ.R. 56 summary judgment motion failed to specifically point to some evidence which affirmatively demonstrates that Busch and Kiefaber have no evidence to support their abuse of process claims, PriMed has failed to satisfy its initial burden, and the trial court was correct in overruling its motion for summary judgment. Dresher v. Burt.
 {¶ 69} PriMed's sixth assignment of error is overruled.
 BUSCH AND KIEFABER'S FIRST ASSIGNMENT OF ERROR {¶ 70} "The Trial Court Erred In Finding That Primed States A Common Law Claim Against Appellees For Breach Of Duties As Employees."
 {¶ 71} PriMed alleged in its counterclaim that Busch and Kiefaber breached the common law duties of employee loyalty they owed PriMed when they hired-away PriMed employees. Busch and Kiefaber moved for summary judgment on PriMed's claim. The trial court denied their motion. Busch and Kiefaber argue that it was inconsistent for the trial court to find the covenant not to solicit PriMed employees to be unenforceable, yet allow a common law claim that they had breached the common law duty they owed PriMed by not hiring-away PriMed's employees.
 {¶ 72} The covenant involves reciprocal private contractual rights and duties while the common law claim alleging a breach of duties involves public rights and duties imposed by law. That the covenant was found to be unenforceable as a matter of public policy does not mean that there cannot be a genuine issue of material fact as to whether Busch and Kiefaber violated a common law duty they owed PriMed. That duty exists independent of any parallel duty the contract imposes. We see no error in overruling Busch and Kiefaber's motion for summary judgment.
 {¶ 73} Busch and Kiefaber's first assignment of error is overruled.
 BUSCH AND KIEFABER'S SECOND ASSIGNMENT OF ERROR {¶ 74} "The Trial Court Erred In Finding That Appellees May Not Make A Claim For Severance Pay."
 {¶ 75} Busch and Kiefaber's original employment agreements included a Compensation and Benefit Plan. The plan provided for severance pay for retiring members. However, in April of 1999, after Busch and Kiefaber had announced their intention to leave, PriMed's board adopted a resolution terminating the severance pay provision.
 {¶ 76} Section 4.3(m) of the Amended Operating Agreement states that the managers of PriMed have the authority to adopt and amend the Physician Compensation and Benefits Plan "after consideration of the recommendations received from time to time from the Members through their respective medical practice departments." Busch and Kiefaber contend that the board never sought their recommendations on the severance plan, and that they were never even made aware of the board's discussions to terminate their contractual right to severance pay. Busch and Kiefaber argue that the board's secretive recission of the severance plan violated the operating agreement and was therefore invalid.
 {¶ 77} The trial court found that it was undisputed that the Amended Operating Agreement was properly enacted and that the recission of severance pay was properly done. It found that the language in the Amended Operating Agreement does not impose a duty on the board to actively solicit the opinions of members prior to amending the Physician Benefits Compensation and Plan. The trial court gave three reasons for its finding, stating:
 {¶ 78} "First, the words `after consideration of the recommendations received . . . by the Members' are qualified by the words `from time to time.' This indicates that Section 4.3 does not mandate that some sort of notice and comment process occur before each amendment, only that the Board consider any recommendations relayed to it on a periodical [sic] basis. Second, the consideration of recommendations language is further qualified by the words `through [member's] respective medical departments.' This establishes no duty upon the Managers to have sought the opinions of [Busch and Kiefaber] prior to their action. Rather, the use of the words indicate that Member's general opinions should be relayed through such departments, which in turn would relay them to the Managers. Third, the power to amend the Physician Benefit Plan was transferred from the section entitled `Limitations of Managers' to that listed as `Powers of Managers.'" (Decision, Order and Entry Sustaining in Part, Overruling in Part, Defendant's Motion for Summary Judgment at 24).
 {¶ 79} The trial court's parsing of the terms of the compensation plan lends support to PriMed's arguments. However, it doesn't resolve the legal issue that Busch and Kiefaber's claim for relief presents. We have held that, like partners, controlling shareholders of a close corporation owe a fiduciary duty to minority shareholders, a duty which is violated when the majority takes action it is authorized to take which nevertheless operates to the disadvantage of the minority and was not undertaken in good faith and for a legitimate business purpose. Schaferv. RMS Realty (2000), 138 Ohio App.3d 144. Busch and Kiefaber are entitled to the benefit of that defense against PriMed's proper exercise of authority which the trial court found when it granted PriMed's motion for summary judgment on the claim for severance pay.
 {¶ 80} Busch and Kiefaber's second assignment of error is sustained.
 BUSCH AND KIEFABER'S THIRD ASSIGNMENT OF ERROR {¶ 81} "The Trial Court Erred In Finding Appellees May Not Recover Receivables Collected By Primed Or Deferred Compensation Lent To Primed."
 {¶ 82} In July of 1996, Busch and Kiefaber agreed to reduce their monthly salaries by $4,150 because other PriMed physicians were not generating revenues sufficient to meet PriMed's needs. Busch and Kiefaber's salaries remained at the reduced amount until they left PriMed. The evidence shows that the amount of the reduction for each totals $323,000.
 {¶ 83} Busch and Kiefaber alleged in their complaint that they "lent cash, contributed capital, accounts receivable and professional services to (PriMed) and made financial advances to pay off (PriMed's) debt with reasonable expectation to receive compensation." They further alleged that PriMed's failure to account for and/or remit the amounts involved constitute conversion and misappropriation.
 {¶ 84} PriMed moved for summary judgment on these claims. The court granted the motion, finding that Busch and Kiefaber's rights were governed by the Operating Agreement, which provides that a physician is due only $1,000 for his or her membership's interest upon departure, and that this amount, which PriMed offered to return, fully satisfies Busch and Kiefaber's rights in relation to compensation for their salary reductions.
 {¶ 85} We agree that the Operating Agreement limits Busch and Kiefaber's claims that some or all of the monies each is allegedly owed were capital contributions, because their rights to return of capital contributions is governed by the Operating Agreement, which as the trial court found allows for only $1,000. That agreement was executed in March, 1996, retroactive to March, 1995. Busch and Kiefaber argue, however, that their subsequent July, 1996 agreement to reduce their salaries was a separate agreement between them and PriMed to defer compensation which they had earned under all standing agreements. They argue that PriMed promised to repay this deferred compensation.
 {¶ 86} Kiefaber testified that "it was agreed that monies advanced to other divisions would be remitted to the cardiology department's restitution as soon as weaknesses in offices of losing physicians were cured." The minutes to the board meeting in which the cardiologists' voluntary reduction in compensation was discussed states:
 {¶ 87} "The members of the PriMed Cardiology Division, who are partners, enact this motion to implement their earlier pledge to assist the reduction of debt and the growth of PriMed and MMA by voluntarily reducing our compensation $4,150 dollars per month for each physician ($20,750 total per month). The following stipulations are invoked:
 {¶ 88} "1. All divisions of PriMed will vigorously engage in programs to improve their performance in the areas of finance, quality and service and will report regularly to the entire membership their improvements;
 {¶ 89} "2. When PriMed achieves financial success[,] the Cardiology division will be considered in light of their voluntary contribution at this time;
 {¶ 90} "3. This voluntary compensation reduction will be reviewed regularly by all divisions in light of PriMed's needs for financial support;
 {¶ 91} ". . .
 {¶ 92} "4. If physicians choose to leave PriMed to compete in this market at a time when the group is financially viable, those leaving agree to compensate Cardiology their % of Cardiology's deferred compensation."
 {¶ 93} Evidence of a subsequent oral agreement may not be offered to alter the terms of a written agreement, but may be used to prove the existence and terms of the separate, oral agreement. Therefore, even though Busch and Kiefaber's evidence cannot vary the terms of the Operating Agreement to the extent that it limits their right to a return of the amount of their salary reductions as capital contributions, the same evidence may be used to show that a separate agreement was made concerning loans that PriMed promised to repay.
 {¶ 94} It is unclear what right Busch and Kiefaber have to reimbursement of the monies they claim as accounts receivable and/or advances due PriMed. Any accounts receivable their medical practices generated were assets of PriMed and due PriMed, not Busch and Kiefaber. Advances are early payments by an obligor, while Busch and Kiefaber's right to salaries were as obligees. Nevertheless, like their loan claims, the claims for reimbursement of accounts receivable each physician generated and for repayment of alleged advances is not limited by the terms of the Operating Agreement that govern return of capital contributions, as the trial court found.
 {¶ 95} Busch and Kiefaber's third assignment of error is sustained in part and overruled in part.
 BUSCH AND KIEFABER'S FOURTH ASSIGNMENT OF ERROR {¶ 96} "The trial court erred in finding that appellees do not state a claim for conversion and misappropriation."
 {¶ 97} Conversion is an exercise of dominion or control wrongfully exerted over property, in denial of, or under a claim inconsistant with the rights of another. Ohio Tel. Equip. Sales, Inc. v. Hadler Realty Co.
(1985), 24 Ohio App.3d 91, 93. Busch and Kiefaber's claim for conversion appears to relate to monies they argue are due from PriMed as severance pay, unpaid salaries, accounts receivable, and pursuant to their promissory notes. In examining Busch and Kiefaber's claim for conversion, the critical issue is whether PriMed was authorized to act as it did.
 {¶ 98} The trial court found that it would have been redundant and inequitable to allow Busch and Kiefaber to pursue their claims for conversion because PriMed had acted in accordance with what it believed to were the terms of the Operating Agreement and the Employment Agreement between PriMed and Busch and Kiefaber. This assumes a good faith defense, but neither motive nor mistake is a defense to a claim of conversion. 18 Ohio Jurisprudence 3d, Conversion and Replevin, Section 22. This is an issue for the trier of fact. Therefore, the trial court erred in disallowing Busch and Kiefaber to pursue their claims for conversion
 {¶ 99} Busch and Kiefaber's fourth assignment of error is sustained.
 BUSCH AND KIEFABER'S FIFTH ASSIGNMENT OF ERROR {¶ 100} "The trial court erroneously concluded primed may not be held accountable pursuant to a claim for promissory estoppel."
 {¶ 101} Busch and Kiefaber alleged that the doctrine of promissory estoppel bars PriMed's assertion of its rights under the Operating Agreement and the Employment Agreement to avoid repayment of the monies Busch and Kiefaber claim they are owed. Busch and Kiefaber argue that they have "presented sufficient evidence that PriMed either expected or should have expected that its words and actions would probably induce reliance on their part."
 {¶ 102} The trial court granted summary judgment to PriMed on Busch and Kiefaber's estoppel claim, finding that the "quasi-contractual relief (sought is) inapplicable." Quasi-contract and promissory estoppel are both equitable doctrines, but promissory estoppel is defensive in nature while quasi-contract enforces a right. Even though Busch and Kiefaber's promissory estoppel claim is nebulous, we cannot find that the trial court's analysis supports a summary judgment on that claim. Application of the promissory estoppel claim is necessarily contingent on a finding in PriMed's favor on Busch and Kiefaber's repayment claims, and those claims remain matters for determination at trial.
 {¶ 103} Busch and Kiefaber's fifth assignment of error is sustained.
 BUSCH AND KIEFABER'S SIXTH ASSIGNMENT OF ERROR {¶ 104} "The trial court erroneously concluded primed has not been unjustly enriched as a matter of law."
 {¶ 105} Busch and Kiefaber's claim for unjust enrichment appear to apply to the repayment of "deferred compensation" they claim they are owed. The trial court construed the several written agreements of the parties to find that Busch and Kiefaber have no enforceable right to the monies they claim they are due. We have held that subsequent oral agreements may have created that right. On remand, whether such agreements were made, independent of the written agreements between these parties, and what rights and duties may have been created as a result, are issues for the trier of fact to determine.
 {¶ 106} In Caras v. Green (June 28, 1996), Montgomery App. No. 14943, we wrote:
 {¶ 107} "It is clearly the law in Ohio that an equitable action in quasi-contract for unjust enrichment will not lie when the subject matter of that claim is covered by an express contract or a contract implied in fact. The mere fact that issues exist as to the creation of the contract or the construction of its terms does not alter this rule." Ryan v. RivalManufacturing Company (December 16, 1981), Hamilton App. No. C-810032, unreported, at 1. As we have stated, ". . . the remedy of unjust enrichment is not available where there is an express contract covering the same subject . . . It is well-established that `the theory of quasi-contract or unjust enrichment is not available when an express contract will afford the complainant the same recovery.'" JosephOldsmobile/Nissan, Inc. v. Tom Harrigan Oldsmobile, Inc. (May 10, 1995), Montgomery App. No. 14788, unreported, at 16 (citations omitted). See also Williams v. Goodyear Aircraft Corp, supra, at 117: ("The law does not recognize the coexistence of a quasi-contract and an express contract covering the same subject."). Id., p. 4.
 {¶ 108} Because Busch and Kiefaber's alleged rights to deferred compensation arise out of their agreement with PriMed, written and/or oral, their claim for unjust enrichment relying on those rights cannot lie. The trial court did not err when it granted summary judgment for PriMed on the unjust enrichment claim.
 {¶ 109} The sixth assignment of error is overruled.
 BUSCH AND KIEFABER'S SEVENTH ASSIGNMENT OF ERROR {¶ 110} "Primed is not the real counterclaimant in interest.
 {¶ 111} Busch and Kiefaber argue that because PriMed is not the real counterclaimant in interest, the trial court erred in denying their motion to dismiss PriMed's counterclaims.
 {¶ 112} PriMed merged with another medical group in 2001. The parties to the merger agreed that any proceeds derived from this litigation will not be the property of the new group, but will instead be divided among the remaining original PriMed members. Busch and Kiefaber argue that PriMed lacks standing to bring the counterclaims because the agreement benefits those members individually, not PriMed.
 {¶ 113} In determining whether an action is brought by the real party in interest, courts must look to the substantive law creating the right being sued upon. Shealy v. Campbell (1985), 20 Ohio St.3d 23, 25. The court must determine if the action has been instituted by a party possessing a substantive right to relief. Id.
 {¶ 114} Busch and Kiefaber's Employment Agreements were with PriMed. Accordingly, because PriMed has not assigned that claim to any other entity, PriMed remains the party that allegedly has been damaged by Busch and Kiefaber's alleged breach of contract. We find no evidence that another entity has assumed PriMed's right to enforce the employment agreements. What PriMed chooses to do with any money that may be recovered through this litigation is purely a board decision subject to the rights of its members, and has no bearing on PriMed's standing to sue.
 {¶ 115} Accordingly, this assignment of error is overruled.
 Conclusion {¶ 116} The judgment of the trial court will be reversed, in part, and the matter remanded to the trial court for further proceedings on the claims for relief remaining for determination.
FAIN, P.J. and WOLFF, J., concur.